**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**Cleveland Division**

| | |
|---|---|
| **LAWSON REALTY, INC. AND LAWSON REALTY CORPORATION, INC.** | ) |
| | ) Civil Action No.: |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MRI SOFTWARE, LLC** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiffs Lawson Realty, Inc. and Lawson Realty Corporation, Inc. (collectively, "Lawson" or "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendant MRI Software, LLC ("MRI" or "Defendant") and allege as follows:

## PRELIMINARY STATEMENT

1. This is an action for breach of contract, breach of warranty, and breach of contractual duties, including the duty of good faith and fair dealing in the performance and enforcement of specific contractual obligations, arising from MRI's systematic failure to deliver functional enterprise software solutions as promised under the parties' agreements.

2. Lawson retained MRI to replace and upgrade its existing software solutions with a single "Enterprise Solution" that would include numerous integrated applications such as Accounts Payable, Affordable Housing, Conventional Housing, Budgeting and Forecasting, Enterprise General Ledger, and Fixed Asset Accounting, among others.

4924-2624-2759.v1

3.      Order Document #1 and Amendment #3 confirm that the SaaS Services included, among other products, Property Management X, Accounts Payable, Advanced User Security, Affordable Housing Management, Application ToolKit, Budgeting & Forecasting, Corporate Accounts Receivable, Enterprise Ledger, Facility Management, General Ledger, Job Cost, Low Income Affordable Housing, MIX, Partner Connect, Purchase Order, Rapid Reports, Reports Design, Residential Management, Virtual Site, Web Design, Workflow Design, Connect Suite products, Callmax products, Fixed Asset Accounting, Lead Management, and related production/non-production databases.

4.      Order Document #2 and Amendment #3 further confirm that Lawson purchased additional Investment Management SaaS Services, including Investment Central and Investor Connect for up to forty-one (41) properties, Investment Accounting for up to 5,500 units, and associated production and non-production databases.

5.      MRI represented that its "Living Suite" of products would enable Lawson to "increase efficiencies and workflows within and between business units" and was "designed to meet the dynamic challenges of [Lawson's] business as [it] continue[s] to grow." MRI promised to "continue to recommend ideas to continue business growth, streamline processes, reduce costs, increase profitability, and enhance [Lawson's] competitive edge."

6.      MRI also made concrete representations about then-existing software capabilities, including integrated workflows, reporting Affordable Housing compliance, HAP reconciliation and payment posting, LIHTC-related compliance management, voucher resident certification, construction cost reporting, retainage tracking, Investment Management data processing, investor reporting, and cross-module functionality.

4924-2624-2759.v1

7.     MRI has fundamentally failed to deliver the promised functionality, resulting in project delays, product defects, product integration failures, conversion issues, and poor support with slow and incomplete resolution of issues.

8.     Despite receiving notice of its material breaches, MRI has failed to cure such breaches and has instead offered only unsupported assertions that its deficient work complies with its "Functional Specifications" while seeking to extract additional payments from Lawson to remedy problems MRI itself created.

9.     MRI also threatened to suspend, and then suspended, Lawson's access to mission-critical systems to compel payment of disputed fees.  Lawson paid those disputed fees under protest and under economic duress to restore access and mitigate immediate operational harm. Lawson seeks restitution of those coerced payments and a declaration that payment did not waive Lawson's claims.

## PARTIES

10.     Plaintiff Lawson Realty, Inc. is a corporation organized and existing under the laws of Virginia, with its principal place of business at 150 West Main Street, Suite 1650, Norfolk, Virginia 23510.

11.     Plaintiff Lawson Realty Corporation, Inc. is a corporation organized and existing under the laws of Virginia, with its principal place of business at 150 West Main Street, Suite 1650, Norfolk, Virginia 23510.

12.     Defendant MRI Software LLC is a limited liability company with its principal place of business at 28925 Fountain Parkway, Solon, Ohio 44139. Upon information and belief, no member of MRI Software LLC is a citizen of the same state as either Plaintiff.

3

4924-2624-2759.v1

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, because MRI's principal place of business is located within this District, and because the parties consented to jurisdiction and venue in this district pursuant to contract.

15.     Section 10.15 of the Master Agreement provides that the Agreement "shall be governed by and construed in accordance with the laws of the State of Ohio without giving effect to its principles of conflict of laws" and that "[a]ny dispute shall be litigated in the state or federal courts located in the State of Ohio," to whose exclusive jurisdiction the parties consented.

## FACTUAL BACKGROUND

### A.     The Contractual Relationship

16.     On or about April 1, 2024, Lawson and MRI entered into Order Document #1 for Recurring Software and Services (the "Order Document #1"), which incorporated by reference the terms and conditions found at www.mrisoftware.com/termsandconditions, including the Master Agreement, SaaS Services Schedule, and Professional Services Schedule. A copy of Order Document #1 is attached hereto as **Exhibit "A."** A copy of the Operative Master Agreement / Exhibit A terms is attached hereto as **Exhibit "B."** A copy of the SaaS Services Schedule is attached hereto as **Exhibit "C."**

17.     On or about April 1, 2024, the parties entered into Amendment #3 to the Agreement, which modified certain terms of the governing documents, including the incorporated Master Agreement, SaaS Services Schedule, and Professional Services Schedule. A copy of Amendment #3 is attached as **Exhibit "D."**

18.     On or about May 31, 2024, the parties entered into a Statement of Work ("SOW") Reference #1150300, pursuant to which MRI agreed to provide implementation services for the MRI suite of products, including Agora Insights, Accounts Payable, Affordable Housing, Budgeting and Forecasting, Enterprise General Ledger, Fixed Asset Accounting, Investment Accounting, Investment Central, and numerous other modules. A copy of the SOW is attached hereto as **Exhibit "E."**

19.     The SOW was executed as an "Inclusive Services" package, meaning the implementation services were included as part of the license fee and Lawson would not be invoiced for such services absent work falling outside the defined project scope.

20.     Under the Agreement, MRI warranted that "the hosted MRI Software supplied to Client as part of the SaaS Services will be free of Errors," with "Errors" defined as "material failures to conform to the published Functional Specifications, reported by client and replicable by MRI."

21.     The SaaS Services Schedule further provides that MRI "warrants that the hosted MRI Software supplied to Client as part of the SaaS Services will be free of Errors," with "Errors" defined as "material failures to conform to the published Functional Specifications, reported by client and replicable by MRI." Section 6.2 of the SaaS Services Schedule provides that MRI "shall, within thirty (30) days of its receipt of Client's written notice, (i) correct such Error; (ii) provide Client with a plan reasonably acceptable to Client for correcting the Error; or (iii) if neither (i) nor

5

4924-2624-2759.v1

(ii) can be accomplished with reasonable commercial efforts from MRI, then MRI or Client may terminate the affected SaaS Service, and Client will be entitled to a refund of the pre-paid portion of the fees paid for the affected SaaS Service."

22. The Agreement provided that MRI's "Functional Specifications" meant "those specifications of the MRI Software's functionality as set forth in the MRI Software LLC and Affiliated companies Functional Specifications, which may be found on www.mrisoftware.com/MRIfunctionalspecs.asp."

23. Section 9.2 of the Master Agreement provides that either party may terminate the Agreement upon written notice if a party "commits a material breach of the Agreement that is not cured in a manner that is acceptable to the other Party within 30 days of being notified by the other Party in writing of the breach or provide a written plan of cure acceptable to the non-breaching Party within thirty (30) calendar days of being notified in writing of such breach."

24. Section 4 of the Professional Services Schedule provides that professional services "may be terminated in accordance with Section 9 of the Master Services Agreement."

**B.     MRI's Failure to Perform**

25. As set forth in Lawson's November 6, 2025 letter to Sam Illgen (the "Lawson Letter"), MRI's failures included, at a minimum: (1) Project Delays and Defects; (2) Product Integration Failures; (3) Conversion Issues; and (4) Poor Support and Slow and Incomplete Resolution of Issues. A copy of the Lawson Letter is attached hereto as **Exhibit "F."**

26. As early as September 2025, Lawson communicated significant concerns to MRI regarding: (1) delays in delivery of promised functionality; (2) demonstrations showing inefficient workflows and processes requiring extra manual steps; (3) incompatibility and integration issues for products needed for both Affordable and Conventional platforms; (4) specific functional

6

shortcomings with the Affordable Platform; (5) user account and permission issues; and (f) lack of integration across MRI modules, which did not function as an enterprise-wide solution.

27.     Lawson's communications identified specific functional failures, requested correction, and placed MRI on actual notice of the material defects and implementation failures described below.

28.     On or about November 6, 2025, Lawson provided MRI with formal notice that MRI had materially breached its contractual obligations by failing to provide the core functionality promised under the Agreement and SOW, failing to make reasonable progress despite repeated notice that its efforts have been untimely, and by providing deliverables that were full of defects and of poor quality.

29.     The Lawson Letter detailed Lawson's position that MRI's failures had risen to the level of a material breach of one or more of the parties' agreements and that Lawson believed it was entitled to partially unwind certain modules for which MRI could not deliver promised functionality.

30.     MRI's December 18, 2025 response (the "MRI Letter") failed to cure the breaches or provide a written plan of cure acceptable to Lawson. A copy of the MRI Letter is attached hereto as **Exhibit "G."**

31.     MRI did not correct the reported Errors within thirty days, did not provide Lawson with a plan reasonably acceptable to Lawson for correcting the Errors, and did not provide commercially reasonable assurances that the affected modules could be made to conform to the Functional Specifications.

4924-2624-2759.v1

### C. Specific Failures of MRI's Products to Conform to Functional Specifications

32.     MRI's software products failed to conform to MRI's published Functional Specifications in multiple material respects. As detailed in the subsections that follow, MRI failed to deliver: (1) the ability to create custom reports as promised, instead requiring users to run multiple reports and pay additional fees for functionality that MRI's Functional Specifications represented would be included; (2) functional subsidy accounting for HAP reconciliation and payment posting, as required for effective management of HUD subsidized housing portfolios; (3) income averaging functionality necessary for compliance with Low-Income Housing Tax Credit ("LIHTC") requirements under 26 U.S.C. § 42(g)(1)(C); (4) the ability to assist Lawson in complying with applicable housing regulations for voucher resident certification; (5) accurate construction cost reporting that properly accounts for retainage as required under Generally Accepted Accounting Principles; and (6) the integrated "Enterprise Solution" that MRI represented would enable Lawson to "increase efficiencies and workflows within and between business units." Each of these failures constitutes an "Error" under the SaaS Services Schedule—a material failure of MRI's hosted software to conform to MRI's published Functional Specifications. A copy of the Relevant Functional Specifications is attached hereto as **Exhibit "H."**

33.     Each failure was material because Lawson selected MRI to operate a multi-property residential and affordable-housing business across up to 5,500 units and up to 41 Investment Management properties, and the missing or defective functionality impaired Lawson's rent collection, accounting, reporting, compliance, applicant processing, tenant management, investment reporting, and internal workflows.

4924-2624-2759.v1

### 1. Conventional Housing Reporting Failures

34. MRI's products failed to provide the ability to create custom reports as promised. MRI's Functional Specifications explicitly recite the ability for authorized users to create a variety of custom reports, yet MRI failed to provide that promised functionality.

35. For example, MRI's response that users must run two delinquency reports and that the rent roll consolidation request constitutes a "report-design item[] for which custom reports are available" is unacceptable because MRI cannot separately charge Lawson for creating such "custom reports" when this functionality was promised under the Functional Specifications.

36. MRI's position confirms that the reporting functionality Lawson required was not delivered in a usable form despite MRI's pre-contract representations, the listed Report Design and Rapid Reports products, and MRI's Functional Specifications.

### 2. Affordable Housing Balance Discrepancies

37. Users must toggle between two views to see subsidy and rent balances, which will not reconcile.

38. MRI's Functional Specifications promise the functionality to "[p]rovide[] subsidy accounting for HAP reconciliation and payment posting."

39. MRI's Functional Specifications specifically promise that the Affordable Housing module: "Provides subsidy accounting for HAP Reconciliation and payment posting." This functionality is fundamental to managing HUD subsidized housing portfolios.

40. MRI's failure to provide functionality to reconcile subsidy and rent balances is a failure to provide "subsidy accounting for HAP reconciliation and payment posting" as promised, and thus constitutes an "Error" pursuant to MRI's SaaS Services Schedule.

9

### 3. Income Averaging Tool Failure

41. The income averaging functionality is not available in MRI's software.

42. MRI's published Functional Specifications promise the following functionality: (1) "Allows authorized users to process certifications, certification approvals, household member data collection for affordable eligibility and rent requirements through the Affordable Housing module"; (2) "Allows authorized users to run rent calculation and Compliance Management... with the following standard funding programs: LIHTC – Low Income Housing Tax Credit funding"; and (3) "Assists clients in complying with occupancy and Compliance Management (i.e. initial program eligibility and rent determination for renters) requirements under current applicable housing regulations."

43. As MRI knows or should know, 26 U.S.C. § 42(g)(1)(C) specifically recites the use of the average income test for purposes of the low-income housing credit.

44. MRI's failure to provide income averaging functionality is a failure to provide LIHTC compliance management as promised in MRI's published Functional Specifications, and thus constitutes an "Error" pursuant to MRI's SaaS Services Schedule.

### 4. Voucher Resident Certification Failure

45. MRI's Functional Specifications explicitly represent that MRI will "assist clients in complying with requirements under applicable housing regulations."

46. MRI's Functional Specifications explicitly represent that the Affordable Housing module "Assists clients in complying with occupancy and Compliance Management (i.e. initial program eligibility and rent determination for renters) requirements under current applicable housing regulations."

4924-2624-2759.v1

47.     MRI has failed to assist Lawson in complying with applicable housing regulations with respect to voucher resident certification data, which constitutes a failure to conform to the applicable Functional Specifications and an "Error" pursuant to MRI's SaaS Services Schedule.

### 5.     Construction Cost Reporting Failure

48.     MRI's construction cost reporting excludes retainage and thus provides inaccurate construction reports.

49.     MRI's Functional Specifications confirm that MRI was to provide functionality to "Manage and track contract workflow through: Construction Costs through control over billing to owners, managers, tenants, or accounts."

50.     MRI's Functional Specifications confirm that JobCost functionality includes the ability to: "Manage and track contract workflow through: Budget Control through compare actual to budget, revisions, validate contracts; Commitments Management through track contracts, subcontracts, change orders, invoices, retainage; process contractor applications; Construction Costs through control over billing to owners, managers, tenants, or accounts."

51.     Generally Accepted Accounting Principles (GAAP) specifically provide requirements for the treatment of retainage in construction projects. MRI's failure to account for retainage in construction costs constitutes a failure to provide the ability to manage and track contract workflow for Construction Costs, which is a failure to comply with MRI's published Functional Specifications and an "Error" pursuant to MRI's SaaS Services Schedule.

### 6.     Product Integration Failures

52.     Lawson identified several product integration failures. MRI sold Lawson an "Enterprise Solution" comprising numerous integrated applications, yet MRI's products are not integrated as promised and represented.

11

53.     MRI sold Lawson an "Enterprise Solution" comprising numerous purportedly integrated applications. The SOW specifically references an "Enterprise Solution Project Scope" and describes the engagement as providing services to "upgrade their technology platform to the MRI suite of products."

54.     MRI has admitted in correspondence that "some offerings are not intended for full cross-module integration." If some products "are not intended for full cross-module integration," MRI should not have concealed that fact during the sales process and should have clearly specified the limitations of its systems in the relevant Functional Specifications. MRI did not do so.

55.     MRI's admission that "some offerings are not intended for full cross-module integration" directly contradicts the representations made during the sales process that Lawson would receive an integrated "Enterprise Solution" designed to "increase efficiencies and workflows within and between business units."

56.     MRI's admission also demonstrates that MRI knew or should have known, before or during contracting, that the software suite had integration limitations material to Lawson's intended use.

### D.     Prior MRI Disputes and Functional Specification Ambiguity

57.     MRI has previously litigated disputes involving allegations that its software failed to perform as promised, that its Functional Specifications were vague or ambiguous, and that its implementation and support obligations were not satisfied.  These matters are relevant to MRI's knowledge of the limitations and ambiguity in its Functional Specifications, the foreseeability of implementation and integration failures, and the reasonableness of Lawson's interpretation of MRI's promises.

4924-2624-2759.v1

58. MRI's conduct toward Lawson reflected MRI's failure to perform specific contractual obligations and its bad-faith use of contractual discretion, including with respect to cure, support, implementation, billing, and suspension of access.

59. MRI has previously attempted to excuse its poor performance in court with similar arguments concerning Functional Specifications, notice, implementation, and support obligations.

60. In *MRI Software, L.L.C. v. West Oaks Mall FL, L.L.C.*, 2018-Ohio-2190 (8th Dist. 2018), the trial court refused to allow MRI to use its vague Functional Specifications as a tool to extract additional money from its customers, noting that MRI's Functional Specifications "do not provide specificity or empirical objective standards" and that terms such as "dynamic and flexible reporting," "analysis," and "command of sales data" are "relative terms which may vary by degrees and have different values to different customers."

61. The trial court in *West Oaks Mall* ultimately concluded that "MRI failed to perform its contractual obligations," citing among other failures the fact that MRI's software caused its customer to: (1) send incorrect statements to tenants; (2) lose a national tenant; (3) open at least 25 support cases with MRI; (4) be unable to bill its tenants or pay invoices out of MRI's software system; and (5) use Windows-based, rather than web-based, workarounds, which resulted in lost productivity.

62. In *Samia Cos. LLC v. MRI Software LLC*, 898 F. Supp. 2d 326, 337 (D. Mass. 2012), the court found that MRI's descriptions of its program's functions were "too broadly worded to support any definitive conclusions regarding their content."

63. In *MRI Software, LLC v. Pac. Capital Mgmt.*, No. 1:15 CV 1268, 2016 U.S. Dist. LEXIS 49077, at *12 (N.D. Ohio Apr. 12, 2016), the court noted that "[t]he contract language cited by the parties does not identify the specific reports that would or would not be included in

4924-2624-2759.v1

the software programming. Therefore, the parol evidence rule does not support dismissal of the fraud in the inducement/negligent misrepresentation claim."

64. MRI's conduct toward Lawson is consistent with these prior disputes in material respects: (1) MRI made broad capability and integration representations; (2) relied on vague Functional Specifications after Lawson complained; (3) attributed deficiencies to configuration, training, customer requests, or customer-side issues; and (4) sought additional payment rather than delivering the functionality Lawson reasonably understood MRI had promised.

### 1. Overpromising at the Sales Stage

65. Like the customers in *West Oaks Mall*, *Samia*, and *Pac. Capital*, Lawson was induced to enter into agreements with MRI based on expansive representations about MRI's capabilities that MRI knew or should have known it could not fulfill.

66. MRI's March 2024 proposal to Lawson stated that MRI's solution would "enable [Lawson's] organization to increase efficiencies and workflows within and between business units" and was "designed to meet the dynamic challenges of [Lawson's] business as [it] continue[s] to grow." MRI promised to "continue to recommend ideas to continue business growth, streamline processes, reduce costs, increase profitability, and enhance [Lawson's] competitive edge."

67. MRI also represented that the modules being sold to Lawson would operate as an enterprise solution for Lawson's property-management, accounting, reporting, and compliance needs, including the Affordable Housing and Conventional Housing workflows that were material to Lawson's decision to contract with MRI.

68. These representations were material because Lawson sought a replacement enterprise platform, not a collection of modules requiring inefficient manual workarounds, duplicative reporting, or additional paid customization to perform basic represented functions.

14

69. MRI's Statement of Work described the engagement as providing services to "upgrade [Lawson's] technology platform to the MRI suite of products," promising an "Enterprise Solution Project Scope" comprising numerous purportedly integrated modules. MRI did not disclose during the sales process that, as it later admitted, "some offerings are not intended for full cross-module integration."

### 2. Vague and Ambiguous Functional Specifications

70. Like the contracts at issue in *Samia* and *Pac. Capital*, MRI's Functional Specifications for Lawson were drafted in a manner that gave MRI maximum flexibility to disclaim responsibility while appearing to promise comprehensive functionality.

71. MRI's Functional Specifications for the Affordable Housing module promised to "[a]ssist[] clients in complying with" "requirements under applicable housing regulations" and to "[p]rovide[] subsidy accounting for HAP Reconciliation and payment posting." These descriptions, like those in *Samia*, were "too broadly worded to support any definitive conclusions regarding their content" and left customers like Lawson to reasonably believe that fundamental compliance functionality would be included.

72. When MRI's Affordable Housing module failed to provide income averaging functionality—a fundamental requirement under 26 U.S.C. § 42(g)(1)(C) for LIHTC compliance—MRI disclaimed responsibility by asserting that "income averaging capability is not guaranteed as part [of] the governing Functional Specification," despite having promised LIHTC compliance management in those same Functional Specifications.

### 3. Blaming the Customer

15

73. When Lawson raised concerns about MRI's failures, MRI responded—as it has done with other customers—by shifting blame to Lawson rather than acknowledging its own deficiencies.

74. In its December 18, 2025 response to Lawson's notice of breach, MRI contended that Lawson had failed to identify any "Errors" by reference to any Functional Specifications, and that Lawson's complaints instead stemmed from MRI's alleged inability to properly configure its systems, its failure to train Lawson, and its failures to complete custom requests—all failures that MRI attributed to factors other than its own performance deficiencies.

75. MRI's contractual structure reinforces this pattern. MRI's Professional Services Schedule provides that "MRI's performance is dependent on Client's timely provision of accurate and complete resources and information," and that if any delay results from the client, "the milestones, fees and date(s) set forth in the SOW shall be adjusted on a T&M basis." This contractual framework enables MRI to attempt to shift responsibility for performance failures onto Lawson.

### 4. Extracting Additional Payments to Remedy MRI's Own Failures

76. MRI attempted to charge Lawson additional fees to remedy deficiencies in MRI's own work, including work that should have been included within the agreed implementation scope, the SaaS Services, or the represented Functional Specifications.

77. In November 2024, MRI issued a Project Change Request seeking $26,000 for "up to 100 hours of additional solution consulting to redo the PMX Financials Conversion"—charging Lawson to fix a conversion that MRI had failed to perform correctly in the first instance. A copy of the PCR / PMX Financials conversion rework document is attached hereto as **Exhibit "I."**

4924-2624-2759.v1

78. MRI's response to Lawson's reporting deficiencies illustrates the same pattern. When Lawson complained that MRI's products failed to provide custom reporting functionality as promised, MRI responded that the "rent roll consolidation request" was a "report-design item[] for which custom reports are available"—effectively demanding that Lawson pay additional fees for functionality that MRI's Functional Specifications had already promised.

### 5. Operational Failures Mirroring Prior Cases

79. Lawson experienced the same categories of operational failures that the *West Oaks Mall* court found constituted MRI's breach of its contractual obligations.

### 6. MRI's Threat and Termination of System Access

80. MRI's coercive and bad-faith conduct extended beyond its failures to deliver promised functionality. In a further demonstration of its disregard for its contractual obligations and basic standards of fair dealing, MRI threatened to cut off, and subsequently did cut off, Lawson's access to MRI's systems in order to compel payment of subscription fees that Lawson disputed and did not believe it owed. A copy of the communications is attached hereto as **Exhibit "J."**

81. Pursuant to Section 3.1 of the Master Agreement, if a client "fails to make payments of any fees due under the Agreement," MRI is "entitled to suspend its performance upon calendar ten (10) days' written notice to Client." MRI invoked this provision to threaten suspension of Lawson's access to MRI's systems.

82. Section 3.1 of the Master Agreement permits suspension only for "fees due under the Agreement." The disputed amounts were not properly due, or alternatively MRI was not entitled to invoke suspension as a coercive remedy, because (1) MRI was already in material

breach, (2) Lawson had given notices of those breaches, (3) MRI had failed to cure, and (4) Lawson had disputed the fees in good faith.

83. At or around the beginning of Year 2 of the Agreement (on or about April 1, 2025), MRI invoiced Lawson for Year 2 annual subscription fees totaling approximately $300,000, consisting of approximately $255,000 in annual recurring fees for SaaS Services under Order Document #1 and approximately $45,000 in annual recurring fees for Investment Management services under Order Document #2. A copy of Order Document #2 is attached as **Exhibit "K."**

84. Lawson disputed these fees and expressly communicated its dispute to MRI. Lawson's position was that it should not be required to pay full annual subscription fees for software that MRI had failed to deliver as promised or that contained material defects rendering it unsuitable for its intended purpose. Lawson had previously communicated these concerns to MRI beginning as early as September 2025, including through its formal notice of material breach. *See* Ex. J at 1.

85. Rather than addressing Lawson's legitimate concerns about MRI's material breaches and product failures, MRI threatened to suspend Lawson's access to MRI's systems if Lawson did not pay the disputed subscription fees. MRI provided Lawson with notice of its intent to suspend services pursuant to the 10-day notice provision in Section 3.1 of the Master Agreement.

86. Concerned about MRI's threats to its business continuity, Lawson asked for a meeting with MRI to discuss and resolve any disagreements in November 2025, again in December 2025, and again in early March 2026. MRI declined to meet with Lawson for months. Finally, on March 18, 2026 MRI scheduled the meeting for March 25, 2026. In parallel, MRI cut Lawson's

18

4924-2624-2759.v1

access to its systems on March 23, 2026 with no additional notice and without coming to the table to discuss the disputes first.

87. Lawson depended on access to MRI's systems for business continuity. Lawson is a property management company that manages a portfolio of approximately forty-one (41) properties comprising approximately 5,500 residential units, including both conventional and affordable housing properties. Lawson's operations—including rent collection, tenant screening, applicant processing, financial accounting, regulatory compliance, and resident communications—were dependent on continued access to MRI's property management software systems.

88. MRI's termination of Lawson's system access caused material disruption to Lawson's operations. Without access to MRI's systems, Lawson was unable to: (1) process rent payments from residents; (2) access tenant and lease records necessary for day-to-day property management; (3) run financial reports and complete accounting functions; (4) screen prospective tenants and process new applications; (5) manage regulatory compliance for its affordable housing properties; and (6) communicate with residents through MRI's resident portals.

89. MRI's stated basis for the access cutoff was to compel payment of subscription fees that Lawson did not believe it owed and had expressly disputed. MRI was aware that Lawson had raised material concerns about MRI's failures to deliver promised functionality and had provided formal notice of MRI's material breaches. Despite this knowledge, MRI elected to exercise its suspension rights to coerce payment rather than address the underlying product failures.

90. To restore access to MRI's systems and mitigate ongoing harm to its business, Lawson was forced to pay the disputed amounts under protest. Lawson expressly communicated

19

4924-2624-2759.v1

to MRI that its payment was made under economic duress and did not constitute a waiver of Lawson's claims against MRI or an acknowledgment that the fees were validly owed.

91. Lawson's payment was not voluntary. Rather, Lawson was compelled to pay by MRI's wrongful conduct, including (1) MRI's bad-faith invocation of a suspension remedy despite Lawson's good-faith dispute, (2) MRI's prior material breaches, and (3) the immediate operational harm caused by Lawson's loss of access to mission-critical systems. MRI exploited its control over Lawson's critical business systems to extract payment that Lawson disputed and believed it did not owe.

92. MRI's conduct in threatening and terminating Lawson's system access to compel payment of disputed fees constitutes a further material breach of the Agreement, a breach of the implied covenant of good faith and fair dealing, and economic duress. MRI abused its contractual suspension rights by exercising them not in good faith response to a genuine payment default, but as a weapon to coerce payment of fees that Lawson had legitimately disputed based on MRI's own material failures to perform.

### E. Damages

93. Lawson has paid substantial sums to MRI for software and services that MRI has failed to deliver as promised.

94. Under the Order Document, Lawson agreed to pay MRI substantial annual recurring fees for SaaS Services covering numerous software modules including Affordable Housing Management, Property Management X, Accounts Payable, Budgeting & Forecasting, Enterprise Ledger, General Ledger, Fixed Asset Accounting, Facility Management, Lead Management, and other products.

4924-2624-2759.v1

95.    Lawson also paid substantial implementation service fees. The original SOW contemplated implementation services valued at approximately $399,131.25, which was included as part of an "Inclusive Services Package" in the license fee structure.

96.    MRI subsequently required Lawson to execute Project Change Requests ("PCRs") for additional work beyond the original SOW scope, including PCR #1213314 in November 2024, which provided for up to 100 additional hours of solution consulting at $260 per hour ($26,000) to "redo the PMX Financials Conversion."

97.    MRI has failed to cure its material breaches despite receiving written notice thereof.

98.    As a direct and proximate result of MRI's breaches, Lawson has suffered damages including, but not limited to: (1) all monies paid to MRI; (2) costs incurred in attempting to use MRI's defective products; (3) costs that will be incurred to transition to alternative software solutions; and (4) other consequential damages resulting from MRI's failures.

99.    Lawson also seeks restitution of amounts paid under protest and under economic duress after MRI suspended Lawson's access to mission-critical systems to compel payment of disputed fees.

## COUNT I: BREACH OF CONTRACT

100.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

101.    Lawson and MRI entered into valid and binding agreements, including the Order Documents, Master Agreement, SaaS Services Schedule, Professional Services Schedule, and Statement of Work.

21

102. Lawson performed its obligations under the agreements or was excused from performance.

103. MRI breached the agreements by, among other things: (1) failing to provide software that conformed to MRI's published Functional Specifications; (2) failing to deliver an integrated "Enterprise Solution" as promised; (3) failing to provide core functionality including subsidy accounting for HAP reconciliation, income averaging for LIHTC compliance, voucher resident certification compliance, construction cost reporting with retainage, and custom reporting capabilities; (4) failing to cure its material breaches within the 30-day cure period; (5) failing to provide a written plan of cure acceptable to Lawson; and (6) wrongfully terminating Lawson's access to MRI's systems in order to coerce payment of disputed fees, in violation of MRI's obligations under the Agreement and the implied covenant of good faith and fair dealing.

104. MRI further breached specific contractual duties by failing to provide commercially reasonable implementation services, failing to provide adequate support, failing to perform the SOW within the agreed project scope, improperly attempting to charge Lawson additional fees to correct MRI's own defective performance, and invoking suspension rights in bad faith despite Lawson's good-faith dispute and MRI's prior material breaches.

105. MRI breached the implied duty of good faith and fair dealing in the performance and enforcement of specific contractual obligations, including obligations concerning cure, support, billing, implementation, access, Client Data, and suspension.

106. As a direct and proximate result of MRI's breaches, Lawson has suffered damages in an amount to be proven at trial.

22

## COUNT II: BREACH OF WARRANTY

107. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

108. Under the SaaS Services Schedule, MRI warranted that "the hosted MRI Software supplied to Client as part of the SaaS Services will be free of Errors," with "Errors" defined as "material failures to conform to the published Functional Specifications, reported by client and replicable by MRI."

109. Lawson reported Errors to MRI, including failures to conform to the published Functional Specifications with respect to: (1) custom reporting functionality; (2) subsidy accounting for HAP reconciliation and payment posting; (3) income averaging for LIHTC compliance; (4) voucher resident certification compliance; (5) construction cost reporting; and (6) cross-module integration.

110. MRI had actual notice of the reported Errors.

111. MRI failed to correct such Errors within thirty (30) days as required under Section 6.2 of the SaaS Services Schedule.

112. MRI further failed to provide Lawson with a plan reasonably acceptable to Lawson for correcting the Errors.

113. As a direct and proximate result of MRI's breach of warranty, Lawson has suffered damages in an amount to be proven at trial, including entitlement to a refund of fees paid for the affected SaaS Services.

23

## COUNT III: FRAUD IN THE INDUCEMENT

114. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

115. MRI made material misrepresentations to Lawson during the sales process concerning the capabilities and functionality of MRI's software products, including representations that MRI would deliver an integrated "Enterprise Solution" with full cross-module integration.

116. MRI's misrepresentations concerned existing facts and present capabilities, including the then-existing functionality, integration, reporting, compliance-management, and implementation capabilities of MRI's software suite.

117. MRI also omitted and concealed material facts, including known limitations on cross-module integration, known limitations on Affordable Housing and LIHTC-related functionality, and known limitations on the ability of MRI's software suite to operate as the enterprise-wide solution Lawson sought.

118. MRI knew or should have known that these representations were false at the time they were made, as MRI has subsequently admitted that "some offerings are not intended for full cross-module integration."

119. MRI made these misrepresentations with the intent to induce Lawson to enter into the Agreement and pay substantial sums for software and services.

120. Lawson justifiably relied on MRI's misrepresentations in entering into the Agreement and paying MRI for software and services.

24

121.    Lawson's reliance was justified because the information concerned MRI's own software products, implementation capabilities, and known integration limitations within MRI's knowledge and not reasonably available to Lawson before contracting.

122.    As a direct and proximate result of MRI's fraud, Lawson has suffered damages in an amount to be proven at trial.

### COUNT IV: NEGLIGENT MISREPRESENTATION

123.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

124.    In the course of its business and in transactions in which it had a pecuniary interest, MRI supplied false information to Lawson concerning the capabilities, functionality, and integration of MRI's software products.

125.    MRI supplied this information for Lawson's guidance in deciding whether to purchase, implement, and pay for MRI's software and services.

126.    MRI failed to exercise reasonable care or competence in obtaining or communicating this information to Lawson.

127.    Lawson justifiably relied on MRI's representations in entering into the Agreement and paying MRI for software and services.

128.    As a direct and proximate result of MRI's negligent misrepresentation, Lawson has suffered damages in an amount to be proven at trial.

### COUNT V: UNJUST ENRICHMENT (In the Alternative)

129.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

4924-2624-2759.v1

130. In the alternative to Lawson's contract claims, Lawson conferred a benefit upon MRI by paying substantial sums for software and services.

131. This claim is pleaded in the alternative only to the extent MRI denies the validity, enforceability, applicability, or scope of the parties' written agreements, or to the extent the Court determines that any amounts paid by Lawson are not recoverable under the written agreements.

132. MRI knew of and retained the benefit conferred by Lawson.

133. Under the circumstances, it would be unjust and inequitable for MRI to retain the benefit without paying the value thereof to Lawson, as MRI failed to deliver the software and services for which Lawson paid.

134. MRI has been unjustly enriched at Lawson's expense, and Lawson is entitled to restitution in an amount to be proven at trial.

## COUNT VI: RESTITUTION OF PAYMENTS MADE UNDER ECONOMIC DURESS

135. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

136. MRI wrongfully threatened to terminate, and subsequently did terminate, Lawson's access to MRI's systems, which Lawson required for its ongoing business operations.

137. MRI's termination of Lawson's system access placed Lawson in a position where it had no reasonable alternative but to pay the disputed fees in order to restore access to systems critical to its business operations and mitigate ongoing harm to its business.

138. As a direct and proximate result of MRI's wrongful conduct, Lawson was coerced into paying approximately $300,000 in disputed fees under protest.

26

4924-2624-2759.v1

139.    MRI's conduct in terminating Lawson's system access was wrongful because MRI exercised its contractual suspension rights in bad faith, not as a legitimate response to non-payment, but as a coercive mechanism to extract payment of fees that Lawson had legitimately disputed based on MRI's own material breaches of the Agreement.

140.    Lawson's payment was not voluntary.  Lawson paid only because MRI's suspension of system access threatened immediate and irreparable disruption to Lawson's property-management, accounting, tenant, applicant, resident-communication, affordable-housing compliance, Investment Management, and owner/investor reporting operations.

141.    Lawson expressly reserved its rights and advised MRI that payment was made under protest, under economic duress, and without waiver of Lawson's claims.

142.    Lawson is entitled to restitution of the amounts paid under economic duress, together with interest and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Lawson Realty, Inc. and Lawson Realty Corporation, Inc. respectfully request that this Court enter judgment in their favor and against Defendant MRI Software LLC as follows:

A.    Compensatory damages in an amount to be determined at trial, including restitution of all monies paid to MRI;

B.    Consequential damages resulting from MRI's breaches;

C.    Rescission of the Agreement and related contracts;

D.    Restitution of amounts paid under protest and economic duress;

27

E.      A declaration that Lawson's payment of disputed fees under protest did not constitute waiver, ratification, accord and satisfaction, or acknowledgment that the disputed amounts were validly owed;

F.      Pre-judgment and post-judgment interest at the maximum rate permitted by law;

G.      Attorneys' fees and costs of suit to the extent permitted by law or contract;

H.      Punitive damages to the extent permitted by law on Lawson's independent tort claims; and

I.      Such other and further relief as this Court deems just and proper.


DATED this 13th day of August 2026.          Respectfully submitted,

**LAWSON REALTY, INC. AND LAWSON REALTY CORPORATION, INC.**


By: */s/ Sandra K. Zerrusen*
Sandra K. Zerrusen (#0070883)
Ty K. Green (#0106311)
JACKSON KELLY PLLC
50 South Main Street, Suite 201
Akron, OH 44308
(330) 252-9060 (Telephone)
(330) 252-9078 (Facsimile)
skzerrusen@jacksonkelly.com
ty.green@jacksonkelly.com

*Attorneys for Plaintiffs*

28

4924-2624-2759.v1